UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

              Plaintiff,

    v.                                      Case No.

DEON PETTY,

              Defendant.

## PLEA AGREEMENT

      1.      The United States of America, by its attorneys, Daniel Kahn, Acting Chief, Fraud Section, Department of Justice, Laura Connelly, Trial Attorney, Leslie S. Garthwaite, Trial Attorneys, and the defendant, Deon Petty, individually and by attorney Jeffrey Purnell, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### <u>CHARGES</u>

      2.      The defendant has been charged in a one-count information, which alleges a violation of Title 18, United States Code, Section 371.

      3.      The defendant has read and fully understands the charge contained in the information.  He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

      4.      The defendant voluntarily agrees to waive prosecution by indictment in open court.

      5.      The defendant voluntarily agrees to plead guilty to the following count set forth in

full in the information, attached hereto as Attachment A.

6.       The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in Attachment A.  The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment B beyond a reasonable doubt.  The defendant admits that these facts are true and correct, and establish his guilt beyond a reasonable doubt.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty.  It is not a full recitation of the defendant's knowledge of, or participation in this offense.

**PENALTIES**

7.       The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine:  five (5) years and $250,000.  The count also carries a mandatory special assessment of $100 and a maximum of three (3) years of supervised release.  The parties further recognize that a restitution order may be entered by the court.  The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraphs 29 and 30 of this agreement.

8.       The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

**ELEMENTS**

9.       The parties understand and agree that in order to sustain the charge of conspiracy as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

    First, that the conspiracy as charged in Count One of the information existed;
    Second, that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and
    Third, one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy.

2

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth Attachment A. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history.  The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history.  The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any

3

particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

**Relevant Conduct**

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

**Base Offense Level**

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the information is six (6) under Sentencing Guidelines Manual § 2B1.1(a)(2).

**Specific Offense Characteristics**

17.     The parties further agree that a 10-level increase for a loss exceeding $150,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(F) is applicable to the offense level for the offense charged in the information.

18.     The parties further agree that a 2-level increase for an offense involving sophisticated means under Sentencing Guidelines Manual § 2B1.1(b)(10) is applicable to the offense level for the offense charged in the information.

**Role in the Offense**

19.     Pursuant to Sentencing Guidelines Manual § 3B1.2, the parties acknowledge and understand that the defendant will recommend to the sentencing court that a decrease for mitigating role is applicable to the offense level for the offense charged in the information. The

4

parties acknowledge and understand that the government may not join in this recommendation; however, the government will advise the sentencing court with regard to any facts or law relevant to this adjustment.

## Acceptance of Responsibility

20.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

21.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement.  The United States Probation Office will make its own recommendations to the sentencing court.  The

5

sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

27. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 45 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets.

6

**Special Assessment**

28.    The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

**Restitution**

29.    The parties acknowledge and understand that the government will recommend to the sentencing court that restitution be ordered and that it be apportioned among conspirators to reflect the level of contribution to the victim's loss and economic circumstances of each conspirator pursuant to Title 18, United States Code, Section 3664(h).

30.    The defendant agrees to pay restitution as ordered by the sentencing court. The defendant agrees to cooperate in efforts to collect any restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

**DEFENDANT'S COOPERATION**

31.    The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

32.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.      If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.      If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.      At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.      At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

33.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above.  The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

8

The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

34. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

35. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

36. The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations.

**Further Civil or Administrative Action**

37. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

9

## GENERAL MATTERS

38.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

39.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

40.      The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

41.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

42.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government.  If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement.  The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement.  The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.  If the defendant and his attorney have

10

signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

43.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty.  The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

Case 2:20-cr-00199-BHL   Filed 11/02/20   Page 11 of 22   Document 4

**<u>Attachment A</u>**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEON PETTY,

Defendant.

Case No.

[18 U.S.C. § 371]

## CRIMINAL INFORMATION

The United States of America charges that:

### Count One
### Conspiracy to Defraud the United States
### 18 U.S.C. § 371

#### *Defendant*

1.    **DEON PETTY ("PETTY")** was a resident of the Eastern District of Wisconsin.

He was the sole owner of Rebels Paris LLC ("Rebels"), which was incorporated as a Wisconsin

limited liability company as of on or about March 14, 2019.

#### *Paycheck Protection Program ("PPP")*

2.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal

law enacted in or around March 2020 and designed to provide emergency financial assistance to

the millions of Americans who are suffering the economic effects caused by the COVID-19

pandemic.

3.    One source of relief that the CARES Act provided for was the authorization of up

to $349 billion in forgivable loans to small businesses for payroll, mortgage interest, rent/lease,

and utilities, through a program referred to as the PPP.  In April 2020, Congress authorized up to $310 billion in additional PPP funding.

4.      The PPP allowed qualifying small businesses and other organizations to receive PPP loans.  Businesses were required to use PPP loan proceeds on payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

5.      The amount of a PPP loan that a small business could have been entitled to receive was determined by the number of employees employed by the business and the business's average monthly payroll costs.

6.      In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

7.      The SBA oversaw the PPP.  However, individual PPP loans were issued by private, approved lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds, which were 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and

the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

8. From in or about May 2020 until in or around July 2020, in the Eastern District of Wisconsin and elsewhere, the defendant,

**DEON PETTY**,

did willfully and knowingly conspire and agree with Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the United States, to commit offenses against the United States, that is, to devise and intend to devise a scheme and artifice to defraud the United States and to obtain money and property belonging to a bank and financial institution by false and fraudulent pretenses and misrepresentations, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1344(2).

### Object of the Conspiracy

9. The object of the conspiracy was for **PETTY** and his co-conspirators to unjustly enrich themselves by fraudulently obtaining PPP funds, and to conceal the conspiracy from lending institutions, law enforcement, and the SBA.

### Manner and Means of the Conspiracy

10. The manner and means by which **PETTY** and his co-conspirators sought to, and did achieve the purpose of the conspiracy included the following:

a. **PETTY** provided information about his company, Rebels Paris LLC ("Rebels") to his co-conspirators for the purpose of using it to submit a false and fraudulent PPP loan application.

b. On or around May 8, 2020, **PETTY's** co-conspirators took the information **PETTY** provided, and then made false statements and certifications on a PPP loan

application for Rebels, submitted to Bank 1 in order to fraudulently obtain $155,000 of PPP loan funds.

c. After the loan to Rebels was funded with PPP funds, **PETTY** caused the funds to be disbursed to individuals who did not work for Rebels, and for expenses unrelated to the company's business operations.

*Overt Acts*

11. In furtherance of the conspiracy and to effect the objects thereof, **PETTY** and his co-conspirators, performed or caused the performance of the following overt act, among others not described herein, in the Eastern District of Wisconsin and elsewhere: on or about June 9, 2020, **PETTY** falsely represented to representatives of Bank 1 the purpose and intended use of the funds obtained through the Rebels PPP loan.

All in violation of Title 18 United States Code, Section 371.

## **FORFEITURE ALLEGATION**

12.     Pursuant to 18 U.S.C. § 981(a)(1)(D) and 28 U.S.C. § 2461(c), upon conviction of an offense in violation of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, as alleged in this Information, the defendant shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.  The property to be forfeited includes, but is not limited to, a money judgment in the amount of the total loss caused by the defendant's criminal conduct, as determined by the Court at sentencing.

13.     If any of the property described above, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Respectfully submitted,

By:

MATTHEW D. KRUEGER
United States Attorney


DANIEL KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

By:

__/s/Laura Connelly_____
Laura Connelly
Leslie S. Garthwaite
Trial Attorneys, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530
(202) 307-1423 (Connelly)
(202) 613-6388 (Garthwaite)
Laura.Connelly@usdoj.gov

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: October 31, 2020

electronically signed - Deon Petty
DEON PETTY
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: October 31, 2020

electronically signed - Jeffrey W. Purnell
JEFFREY PURNELL
Attorney for Defendant

For the United States of America:

Date: October 31, 2020

Leslie S. Garthwaite
LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys

12

**<u>Attachment B</u>**

The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

***The Paycheck Protection Program***

      1.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

      2.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications, including that the business was in operation on February 15, 2020, in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

      3.      A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

      4.      PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

      5.      The PPP is overseen by the SBA, which is headquartered at 409 3rd Street SW, Washington, D.C. 20416, and has authority over all loans. Individual PPP loans, however, are issued by private approved lenders (most commonly, banks and credit unions), which receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

      6.      Bank 1 is an SBA-approved lender headquartered in Green Bay, Wisconsin.

*The Co-Conspirators*

7.     The defendant was a citizen of the United States and resident of Wisconsin.

8.     The defendant was the owner and registered agent of Rebels Paris, LLC ("Rebels"), located in Milwaukee, Wisconsin.  Rebel's Employer Identification Number issued by the U.S. Internal Revenue Service ended in 5567.  Rebels has been registered as a Wisconsin limited liability company since on or about March 14, 2019.  As of February 15, 2020, Rebels did not have any employees for whom it paid salaries or payroll taxes, or independent contractors as reported on an IRS Form 1099-MISC.

9.     The defendant agreed with Co-Conspirator 1 (CC-1), Co-Conspirator 2 (CC-2), and Co-Conspirator 3 (CC-3) to submit a fraudulent application for a PPP loan for Rebels and split the proceeds.

10.     On or about May 8, 2020, at CC-2's direction, the defendant opened a business checking account for Rebels at Bank 1.  The defendant was the sole authorized signatory on the account.

*The Fraudulent PPP Loan Application*

11.     In or around May 2020, CC-3 introduced the defendant to CC-2.  CC-2 offered to help the defendant get a loan for his business, Rebels, and the defendant agreed to assist CC-2 in this effort.  In exchange for helping Rebels get a loan, CC-2 requested that the defendant share a portion of the loan proceeds once received.  In response, and to accomplish the goals of their agreement, the defendant provided CC-2 with the business information requested, including the business address and EIN.  In addition, the defendant met in person with CC-2 and another individual in the parking lot near Bank 1, where defendant signed records he understood to be part of the loan application materials.

12.     On or about May 8, 2020, using information that the defendant provided about Rebels, and the records signed by the defendant, CC-2 submitted a PPP loan application package for Rebels to Bank 1, requesting a $155,000 PPP loan for Rebels.  Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Rebels's payroll data from January 2019 to March 2020  The Rebels PPP application submitted to Bank 1 falsely stated that Rebels's average monthly payroll was $62,000 and that the company had 17 employees.  The defendant did not review the loan package before it was submitted to the bank.

13.     The SBA Form 2483 falsely certified that Rebels was "in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC."  The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule."  The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

15

14.     The IRS Forms 941 that were included with the PPP loan application, which the defendant signed, falsely represented, among other things, that Rebels had 17 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Rebels had paid $190,486.16 in wages, tips, and other compensation to its 17 employees. In fact, Rebels made no quarterly tax filings in 2019 or in the first quarter of 2020.

15.     On or about May 18, 2020, Bank 1 approved the PPP loan and wired approximately $155,000 to the Rebels business checking account at Bank 1.

16.     On or about May 20, 2020, at CC-2's direction, the defendant distributed $45,000 to CC-1 and his entities, Company A and Company B, using cashier's checks; and distributed $30,000 to CC-2 and his entity, Company C. The defendant also distributed $20,000 to CC-3 using a cashier's check.

17.     After receiving the PPP loan funding, the defendant also transferred money and wrote checks to himself.

*False Statements to Bank 1*

18.     On or about June 7, 2020, Bank 1 froze the funds in the Rebels business account. On or about June 9, 2020, a Bank 1 representative called the defendant to discuss the Rebels PPP loan. On June 8, 2020, the defendant contacted CC-2 and CC-3 to determine how to respond. CC-2 provided the defendant and CC-3 with a cover story. CC-1 also provided the defendant with a lease dated July 1, 2020 between Rebels and CC-1's company, Company A, purporting to support some of Rebels' expected uses of the PPP loans. In fact, at the time he paid CC-1, the defendant was not actually entering into a lease with Company A, and the defendant did not receive the property identified in the lease from Company A.

19.      In furtherance of the conspiracy, and to conceal the existence of and his participation in the conspiracy, the defendant falsely provided that cover story to the representative of Bank 1, including falsely claiming that Rebels had 17 employees whom he paid by direct deposit or check. The defendant further falsely stated that the money to CC-1 was for rent, the money to CC-2 was for a mentorship program, and that CC-3 was an employee and the money to him was for back pay.

20.     On or about June 9, 2020, the defendant sent a list of employee names for Rebels to Bank 1, which he created, knowing that the list of names was false. The defendant also provided Bank 1 with a signed copy of the lease between Company A and Rebels.

*False Statement to Law Enforcement*

21.     On or about July 7, 2020, the defendant was interviewed by agents of the Federal Bureau of Investigation. In furtherance of the conspiracy and to conceal the existence of and his participation in the conspiracy, the defendant falsely told agents that Rebels had 17 employees and that CC-3 was an employee of Rebels. This was the story that the defendant and CC-2 agreed that the defendant would provide, if asked.

16